**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES LILLY, | CASE NO. 1:25-CV-00027-DAR |
| Plaintiff, | DISTRICT JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff James Lilly ("Plaintiff" or "Mr. Lilly") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.     Procedural History

Mr. Lilly filed his DIB application on February 22, 2022, alleging disability beginning on June 7, 2020. (Tr. 54.) He alleged disability due to three damaged cervical vertebra and right shoulder nerve damage. (*Id*.) The application was denied at the initial level and on reconsideration. (Tr. 54, 65.) Mr. Lilly requested a hearing before an Administrative Law Judge ("ALJ") and testified at a hearing on July 5, 2023. (Tr. 42-53.) On August 18, 2023, the ALJ found he was not disabled from June 7, 2020, the alleged onset date, through the date of the

1

decision.  (Tr. 24-41.)  Mr. Lilly appealed this decision to the Appeals Council, which found no reason to review the decision, making the 2023 decision the final decision of the Commissioner.  (Tr. 11.)  Mr. Lilly then filed the instant Complaint requesting a review of the Commissioner's final decision.  (ECF Doc. 1.)  The case is fully briefed and ripe for review.  (ECF Docs. 9, 10.)

**II.      Evidence**

**A.      Personal, Educational, and Vocational Evidence**

Mr. Lilly was born in 1969 and was 51 years old on the alleged disability onset date, making him an individual approaching advanced age under Social Security regulations on the alleged onset date.  (Tr. 55.)  He has at least a high school education. (Tr. 165.)  Mr. Lilly has not worked since June 7, 2020, the alleged onset date.  (Tr. 55.)

**B.      Medical Evidence**

**1.      Relevant Treatment History**

**i.      Treatment Related to Physical Impairments**

On June 7, 2020, Mr. Lilly presented to the emergency room after an injury at work, complaining of pain in his right shoulder and pain in his right arm with weight bearing.  (Tr. 492, 585-628).  On physical examination, his neck was supple, he had normal sensation in both hands, and he had fair range of motion of the right arm except for pain with rotation and elevation.  (Tr. 591.)  X-rays of the shoulder revealed no acute fracture or malalignment, moderate acromioclavicular and minor glenohumeral osteoarthropathy, and no definite soft tissue swelling.  (Tr. 581.)  Mr. Lilly was diagnosed with a shoulder strain and discharged that day.  (Tr. 594.)

On June 23, 2020, Mr. Lilly presented to Kraig Solak, D.O., at Precision Orthopedic Specialties, Inc.  (Tr. 633-35, dup. at 1052-54.)  He reported shoulder and neck pain radiating into both arms and down to the middle of his back, bilateral numbness in both hands and arms,

2

and weakness in both hands.  (Tr. 633.)  A physical examination revealed markedly limited range of motion of the cervical spine, significant pain with Spurling's maneuver, and significant weakness in the hands and right triceps.  (Tr. 634.)  It also showed subjective dysesthesias in both hands with intact fine motor skills.  (*Id.*)  Dr. Solak reviewed x-rays of the cervical spine that showed severe degenerative changes at C5-6 and C6-7.  (*Id.*)  He diagnosed spinal stenosis, cervical region, ordered an MRI, and prescribed Prednisone, Baclofen, and a soft collar.  (*Id.*)

Mr. Lilly underwent an MRI of the cervical spine without contrast on June 24, 2020.  (Tr. 764-65.)  The MRI demonstrated the following: a disc herniation at C4/5; central spinal canal stenosis at C5/6; discogenic spondylosis with cord compression C5/6; discogenic spondylosis C3/4 and C6/7; and mild to moderate foraminal stenosis C2/3 through C6/7.  (Tr. 765.)

Following the MRI, on June 25, 2020, Mr. Lilly was seen by orthopedist George Kellis, M.D., at Dr. Solak's referral.  (Tr. 642-43.)  Mr. Lilly reported that some of his radicular symptoms had improved with the use of steroids, but he still experienced neck ache and radicular pain in the left arm greater than the right, as well as generalized weakness of the upper extremities.  (Tr. 642.)  On examination, he had grade four weakness in the finger flexors and both triceps, intact sensation and reflexes, and pain on cervical range of motion, primarily with left lateral rotation.  (*Id.*)  Dr. Kellis also reviewed Mr. Lilly's cervical MRI, noting the severe degenerative changes at C5 and C6, and noting mild central compression of the cord at C6 and C5, as well as a central and left paramedian herniation at C4.  (*Id.*)  He found no evidence of instability, spondylolisthesis, or unusual motion in the cervical spine.  (Tr. 643.)  He diagnosed cervicalgia and radiculopathy and ordered physical therapy (*id.*), which Mr. Lilly started the next day.  (Tr. 637-39, dup. at 307-09.)

Mr. Lilly attended physical therapy consistently for the next couple of weeks. (*See* Tr. 293-94 (dup. at 1040-41), 299-306 (dup. at 559-72, 1044-47).) In early July 2020, he reported that his neck pain had improved overall since beginning therapy, he no longer had headaches, and he was able to sleep better at night. (Tr. 293, 299-306).

Mr. Lilly returned to see Dr. Kellis on July 9, 2020. (Tr. 702-03.) He had attended five physical therapy appointments and said he saw improvement in his headaches and ability to sleep, but continued to have pain when active. (Tr. 702.) Dr. Kellis indicated that Mr. Lilly's "motor, sensory, and reflex functions of the upper extremities [had] returned to normal." (*Id.*) He continued Prednisone and Baclofen and provided an excuse from work note. (*Id.*)

On July 21, 2020, Mr. Lilly sought chiropractic care from David Copp, D.C., at Aligned Chiropractic. (Tr. 1260-61.) He reported his neck and right shoulder pain was 8/10, but it varied. (Tr. 1260.) His initial physical examination showed significantly decreased range of motion in the cervical spine and right shoulder, palpatory tenderness from C4-7 and over the right shoulder, joint dysfunction in the cervical spine and right shoulder, muscle weakness over the C4-7 levels and in the right shoulder and arm, and muscle spasms in the cervical spine and right shoulder. (Tr. 1260-61.) Dr. Copp diagnosed cervical sprain and right shoulder sprain. (Tr. 1261.) He recommended chiropractic therapy three times a week for six to eight weeks, followed by reexamination. (*Id.*) Mr. Lilly attended chiropractic appointments repeatedly during the end of July and through August 2020, reporting moderate to severe pain in the neck and right shoulder with stiffness and spasms. (Tr. 525-45, 629-32.) Physical examinations consistently showed hypertonicity, decreased range of motion in the cervical spine and right shoulder, and at times decreased strength in the cervical spine and right shoulder. (*Id.*)

4

On August 13, 2020, Mr. Lilly followed up with Dr. Kellis.  (Tr. 295-96, dup. at 745-46.)
Although his strength had improved, he reported that he experienced radicular pain and
intermittent weakness with any activity, greater on the left than the right.  (*Id.*)  He was still
attending physical therapy twice per week but was not taking any pain medication.  (*Id.*)  On
examination, his motor function had returned to grade five, his sensation was intermittently
diminished in the arms, and his reflexes remained symmetrical.  (*Id.*)  Dr. Kellis added spinal
stenosis, cervical region to his other diagnoses and discussed the possibility of surgery with Mr.
Lilly.  (Tr. 295-96.)  He continued Mr. Lilly's medications.  (Tr. 296.)

On August 19, 2020, Mr. Lilly underwent an independent medical examination by Paul
Martin, M.D., for the purposes of his Workers' Compensation claim.  (Tr. 284-92.)  He had:
mildly limited range of motion of the cervical spine and both shoulders; minimal midline
cervical tenderness; decreased sensation in the right shoulder, wrist, and right small finger;
decreased reflexes in the triceps; decreased motor function in the left ulnar with attempted finger
abduction; and a positive impingement in the right shoulder.  (Tr. 287-88.)  Dr. Martin opined
that there was diagnostic evidence of multilevel cervical spine abnormalities due to natural
deterioration but insufficient evidence to support a diagnosis of cervical sprain.  (Tr. 289-90.)
Dr. Martin affirmed this opinion on January 28, 2021, after reviewing new records.  (Tr. 803-07.)

Between September 2020 and January 2021, Mr. Lilly attended chiropractic treatment
with Dr. Copp every week or two, reporting severe pain, paresthesia, stiffness, and spasms in his
right shoulder.  (Tr. 460-67.)  Physical examination findings showed decreased range of motion
in the cervical spine and right shoulder, but treatment was effective and well-tolerated.  (*Id*.)

Mr. Lilly continued to attend chiropractic appointments throughout February and March
2021, reporting severe pain, paresthesia, stiffness, and spasms in his right shoulder.  (Tr. 415-21,

441-52 dup. at 793-800.)  He continued to display hypertonicity with decreased strength as well as decreased range of motion in the cervical spine and right shoulder at most appointments; treatment was nonetheless still considered effective and well-tolerated.  (*Id.*)  Records from five appointments in late April and early May 2021 remain unchanged.  (Tr. 354-59.)  At an appointment on October 5, 2021, he reported worse pain, but his physical exam remained unchanged.  (Tr. 1011.)

Mr. Lilly saw Dr. Kellis on May 18, 2021.  (Tr. 749-50.)  His symptoms had not changed from the previous month, when he reported continued cervical pain and radicular-type symptoms in the arms and hands, which worsened with use.  (Tr. 374, 749.)  He wanted to discuss surgical options.  (Tr. 749.)  On examination, he had finger flexion and triceps weakness greater on the left than the right and diminished sensation and pain that radiated primarily into the C7 and C8 distribution.  (*Id.*)  Dr. Kellis noted that Mr. Lilly had stopped smoking and would be a candidate for surgery once approval was obtained.  (*Id.*)  He ordered an EMG and a nerve conduction study ("NCS") to document radiculopathy.  (*Id.*)

Mr. Lilly underwent the EMG on June 1, 2021, and it was consistent with a nerve root lesion on or about the C5-6 nerve root bilaterally.  (Tr. 386-88, dup. at 757-59.)  The NCS was normal.  (Tr. 386.)  An examination at the time of the testing showed moderate tightness in the bilateral cervical paraspinal/upper trapezius regions with normal strength in the arms, intact sensation and reflexes, normal range of motion in the upper extremities, and decreased range of motion in the cervical spine.  (Tr. 387-88, dup. at 787-88.)

At a June 1, 2021 physical therapy appointment, Mr. Lilly continued to report "broad-based cervical pain with radicular symptoms including numbness/tingling into the bilateral upper

extremities." (Tr. 752.) On examination he showed normal strength, intact sensation, intact reflexes, and shoulder range of motion within normal limits. (Tr. 753.)

On June 3, 2021, Mr. Lilly presented to Dr. Kellis, continuing to remain very symptomatic with neck pain and radiculopathy into both arms. (Tr. 367.) His examination was unchanged from the previous visit. (*Id.*) Dr. Kellis noted that based on the EMG results, the radiculopathy was being caused by disc herniation at C4-C5. (*Id.*)

On August 4, 2021, Mr. Lilly underwent an independent medical examination by Douglas Gula, D.O., for his Workers' Compensation claim. (Tr. 323-29.) At that time, he was only taking Motrin. (Tr. 324.) A physical examination showed tenderness to palpation of the right paracervical area and the right shoulder, decreased range of motion of the cervical spine, a positive foraminal compression test, negative Adson's and Spurling's tests, and intact sensation, diminished reflexes, and normal strength in the upper extremities. (Tr. 325.)

At a chiropractic appointment on February 11, 2022, Mr. Lilly reported dull aching neck pain and stiffness in the arm with numbness and tingling as well as sharp right shoulder pain. (Tr. 1011.) He displayed decreased strength and range of motion in the cervical spine and right shoulder as well as hypertonicity. (*Id.*) Treatment was effective and well-tolerated. (*Id.*; *see also* Tr. 1004, 1006 (recording similar appointments throughout the rest of February 2022).) He was reevaluated ten days later and found to have positive distraction and shoulder depression tests, positive foraminal compression at C5-7, and significantly reduced range of motion in the cervical spine. (Tr. 1005.) Monthly appointment records from summer and fall 2022 continue to record Mr. Lilly's reports of pain, stiffness, paresthesia, and spasms in his neck and right arm/shoulder. (Tr. 997, 1000-02.) His physical exams continued to show decreased range of motion and strength in the cervical spine and right shoulder. (*Id.*) An evaluation on October 10,

2022, indicated that Mr. Lilly was positive for foraminal compression at C4-7 and down his arm and had significantly decreased range of motion at the cervical spine.   (Tr. 999.)

Mr. Lilly attended chiropractic appointments with Dr. Copp monthly into 2023.  (Tr. 1254-55.)  He continued to report severe pain, stiffness, spasms, and paresthesia in his neck and shoulder.  (*Id*.)  Physical exams did not record decreased strength as they had in the past but continued to show decreased range of motion and hypertonicity in the cervical spine.  (*Id*.)

### ii.    Treatment Related to Mental Impairments

On December 16, 2022, Mr. Lilly presented to Audra Kirchmeir, LISW, for a behavioral health assessment.  (Tr. 1027-31.)  He was seeking mental health treatment on his own due to anxiety and depression related to his injury. (Tr. 1028.)  He denied taking any psychotropic medication or having a history of mental health counseling or psychiatric services.  (Tr. 1029, 1031.)  He reported symptoms of sadness, hopelessness, worthlessness, restlessness, fatigue, sleeping too little, poor self-esteem, weight loss, irritability, lack of motivation, decreased appetite, nervousness, hypervigilance, uneasiness, worry, muscle tension, racing thoughts, avoidance, difficulty focusing, flashbacks, nightmares, diminished interest, and poor focus.  (Tr. 1028.)  He reported no plans to harm himself or others.  (Tr. 1029.)  On examination, Mr. Lilly had a neat appearance and maintained good eye contact.  (Tr. 1030.)  His displayed restless motor activity, unremarkable speech, flat affect, nervous and anxious mood, and tangential thought process.  (*Id.*)  He was alert and fully oriented with unremarkable thought content, cooperative demeanor, and fair insight and judgment.  (*Id.*)  LISW Kirchmeir referred him for primary care and counseling services and opined that his prognosis was fair provided he actively participated in recommended treatment.  (Tr. 1031.)

On December 22, 2022, Mr. Lilly saw Chistian Mixon, LSW for counseling.  (Tr. 1025-26.)  He reported an inability to sleep well, having few friends, and experiencing increased worry, fatigue, anxiety, and depression, although he was "managing."  (Tr. 1025.)  He also stated that he did not recognize his symptoms as problematic or of concern when he was around others.  (Tr. 1026.)  On mental status examination, he had appropriate appearance, cooperative behavior, unremarkable speech, thought content, and perception, neutral mood, and appropriate affect, judgment, and insight.  (Tr. 1025.)

Mr. Lilly returned to see LSW Mixon on January 5, 2023.  (Tr. 1024-25.)  He reported feeling the same as he did at the previous sessions.  (Tr. 1024.)  His depression increased at night due to neck pain and decreased in the morning when he started moving around.  (*Id.*)  He said he did not talk to people anymore.  (*Id.*)  He engaged in the session and appeared to be coping.  (*Id.*)  His mental status examination was unchanged from the previous visit.  (*Id.*)  Mr. Lilly reported feeling the same at a January 12, 2023 appointment, saying he was concerned about the future.  (Tr. 1022.)  He was alert and active and displayed appropriate appearance, cooperative, lethargic, and irritable behavior, unremarkable speech, neutral, nervous, and anxious mood, appropriate affect, insight and judgment, and unremarkable thought content and perception.  (*Id.*)

### 2.   Opinion Evidence

#### i.   Treating Source

On May 9, 2023, David Copp, D.C., completed a Medical Source Statement regarding Mr. Lilly's physical capabilities.  (Tr. 1250-53.)  Based on an MRI scan and clinical findings of reduced range of motion and weakness, he found Mr. Lilly had disc herniation at C4-5, C5-6, and C6-7 with a poor prognosis.  (Tr. 1250.)  Mr. Lilly's symptoms included pain, stiffness, numbness, and weakness in the neck and arms.  (*Id.*)

9

Due to pain, numbness, paresthesia, and muscle weakness, Dr. Copp opined that Mr. Lilly: could walk one city block without rest or severe pain; could sit or stand 15 minutes at one time before needing to change positions; could sit or stand/walk less than two hours total in an eight-hour work day; needed a job that permitted shifting positions at will; needed opportunities to walk as well as eight unscheduled, 15-minute breaks eight times each during an eight-hour workday.  (Tr. 1251-52.)  He opined that Mr. Lilly could: occasionally lift/carry less than ten pounds; never lift/carry ten pounds or more; occasionally twist and climb stairs; rarely stoop/bend and climb ladders; and never crouch squat.  (Tr. 1252.)  He further opined that Mr. Lilly: could grasp, turn, twist, perform fine manipulations, and reach in all directions bilaterally up to ten percent of the workday; would be off task 25% or more of the workday; was capable of moderate or normal stress work; and would be absent about four days per month due to overthinking, worrying too much, and dealing with pain that interfered with the ability to concentrate and work.  (Tr. 1252-53.)

### ii. Consultative Examiners

#### a) Dorothy Bradford, MD

On June 16, 2022, Mr. Lilly underwent a physical consultative examination with Dorothy Bradford, MD. (Tr. 977-85.) He reported neck and shoulder pain with pain down the arms that started after he fell at work in June 2020. (Tr. 977.)  On physical examination, Mr. Lilly's neck was supple but demonstrated a decreased range of motion; he had no spinal tenderness; he showed normal strength in all muscle groups and normal range of motion in all joints; his gait was normal; his cranial nerves were grossly intact; and he displayed no focal neurological deficit. (Tr. 978.)  He was alert and oriented, displayed normal affect, and had normal eye

contact. (*Id.*) Dr. Bradford opined that Mr. Lilly had degenerative joint disease of the cervical spine with intermittent radicular symptoms and should be restricted to sedentary activity. (*Id.*)

### b) Natalie Whitlow, Ph.D.

On September 22, 2022, Natalie Whitlow, Ph.D., conducted a consultative psychological examination of Mr. Lilly. (Tr. 986-96.) Mr. Lilly reported that he was experiencing anxiety, depression, and stress due to an accident at work that caused pinched nerves in his neck and nerve damage to his right shoulder. (Tr. 987.) The injury caused pain and numbness in his shoulder and down his arms that prevented him from working. (*Id.*) Dr. Whitlow noted that Mr. Lilly did not present with any significant, observable, or readily identifiable mental health signs but did present with an unpleasant and frustrated demeanor. (Tr. 989.)

Regarding his activities of daily living, Mr. Lilly reported that he was unable to get sufficient sleep due to pain, which caused his mind to be "foggy," and explained "constant pain causes your memory and focus to be screwed." (Tr. 987, 989.) He had unhealthy eating patterns because he was physically unable to cook meals. (Tr. 989.) He had healthy personal hygiene habits, but it took a lot of effort to attend to his hygiene. (*Id.*) He was dissatisfied with his social and interpersonal functioning, describing it as "nonexistent" because he lacked the strength and energy to get out of his apartment. (*Id.*) He lived alone and was able to perform minimal household chores and manage his finances. (*Id.*)

On mental status examination, Mr. Lilly maintained appropriate eye contact, was cooperative but not friendly or pleasant, and was alert, attentive, and coherent. (Tr. 990.) His speech and thought processing were normal, his affect was stable, he did not present with signs of anxiety, and he denied anxiety conditions that would impair his working ability. (*Id.*) He was fully oriented and could correctly answer basic questions about his identity, the year, and the

purpose of the evaluation.  (*Id.*)  He could also perform basic multiplication, knew famous historical figures such as Martin Luther King, Jr., knew how many states are in the United States, and could compare and contract apples and oranges.  (Tr. 990-91.)  He appeared to possess average cognitive functioning (Tr. 990) and fair insight and judgment (Tr. 991).

Dr. Whitlow diagnosed Mr. Lilly with Adjustment Disorder with Anxiety and Depressed Mood.  (*Id.*)  She opined that while she diagnosed him with adjustment disorder, she did not gather sufficient evidence to support a conclusion that Mr. Lilly's mental health symptoms were so severe as to impair his ability to function and work.  (Tr. 992.)  She found that he had no limitations in the four areas of mental functioning.  (Tr. 993.)

### c)  Jonathan D. Gordon, Ph.D.

On March 18, 2022, Mr. Lilly underwent a consultative psychological examination with Jonathan D. Gordon, Ph.D.  (Tr. 1242-49.)  Dr. Gordon wrote his report on May 2, 2022. (Tr. 1242.)  Mr. Lilly described his work injury and medical history (*id.*), and Dr. Gordon reviewed select medical records and opinions from other doctors (Tr. 1243).

Mr. Lilly reported that he was in a "constant low level of pain" that increased with any activity.  (Tr. 1243.)  At the examination, his pain was 4/10.  (*Id.*)  He described his mental status as being "angry, bored, and hopeless," anxious about the future, and worried about his health and ability to do things. (Tr. 1244.)  He felt depressed most of the time.  (*Id.*)  His appetite and libido were low, and he had lost about 20 pounds in the previous six months.  (Tr. 1246.)  He denied suicidal or homicidal ideations.  (*Id.*)  He stated that he had not sought counseling earlier because he had hoped he would be approved for surgery, and it would fix his physical issues.  (*Id.*)

During the examination, Mr. Lilly maintained good eye contact, was appropriately responsive, displayed normal, logical, and coherent speech, and answered questions sincerely

and forthrightly.  (Tr. 1242-43.)  He was well oriented, showed no indications of psychosis, and displayed depressed and anxious mood/affect.  (Tr. 1245-46.)  Grooming was marginal, and hygiene was "reportedly within normal expectations."  (Tr. 1246.)  Mr. Lilly was able to: name the current and previous three presidents and the governor of Ohio; recite the months of the year in reverse order; count backwards from 100 by serial 7s; interpret proverbs; and answer questions related to social skills and nuances.  (*Id.*)  Based on Mr. Lilly's vocabulary and content of speech, Dr. Gordon estimated that his IQ fell in the average to high average range.  (*Id.*)

Dr. Gordon administered the Minnesota Multiphase Personality Inventory-2-Restructed Form ("MMPI-2-RF"), a self-administered inventory.  (Tr. 1246-47.)  Dr. Gordon opined that, based on his training and experience administering this test, the results were invalid and uninterpretable due to excessive inconsistency and variable responding to test items.  (Tr. 1247.)  This level of inconsistency could result from reading or language comprehension problems, cognitive impairment, non-cooperative test-taking approach, or erroneously recorded items.  (*Id.*)  In this case, Dr. Gordon opined that the inconsistent response could be caused by Mr. Lilly's depression, having a low interest level, distractibility, and intrusive thoughts that may have interfered with his ability to stay adequately focused on the test items.  (*Id.*)  He did not think Mr. Lilly was purposely uncooperative.  (*Id.*)

Dr. Gordon diagnosed Mr. Lilly with Major Depressive Disorder, Single Episode, Severe, with Anxious Distress, Moderate-Severe.  (*Id.*)  He found this diagnosis was a direct and proximate consequence of Mr. Lilly's physical conditions.  (Tr. 1249.)

### iii.    State Agency Medical Consultants

On June 27, 2022, state agency medical consultant Lynne Torello, M.D., conducted a physical Residual Functional Capacity ("RFC") assessment of Mr. Lilly.  (Tr. 61-63.)  She

opined that Mr. Lilly had the following limitations: occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; stand/walk or sit for six hours in an eight-hour workday; occasionally climb ladders, ropes, and scaffolds and crawl; frequently climb ramps and stairs, kneel, and crouch; and frequently handle, finger, and reach in all directions.  (Tr. 61-62.)  He should also avoid even moderate exposure to unprotected heights.  (Tr. 63.)  On January 13, 2023, Mehr Siddiqui, M.D., affirmed Dr. Torello's opinion.  (Tr. 71-72.)

### iv.  State Agency Psychological Consultants

On November 7, 2022, state agency psychological consultant Aracelis Rivera, Psy.D., conducted a psychiatric review technique ("PRT") of Mr. Lilly.  (Tr. 59-60.)  She opined that he had no limitations in the four categories of mental functioning.  (Tr. 59.)  On January 24, 2023, on reconsideration, state agency psychological consultant Kristen Haskins, Psy.D., affirmed Dr. Rivera's opinion.  (Tr. 68-69.)

### C.  Function Report

On May 5, 2022, Mr. Lilly completed an Adult Function Report.  (Tr. 176-84.)  He lived alone in an apartment.  (Tr. 176.)  His conditions limited his ability to work in that they limited the amount of movement he could do, he had an eight-pound lifting limit, all movement caused pain, and the pain affected his concentration.  (*Id.*)

Mr. Lilly slept 60-90 minutes at a time due to pain.  (Tr. 177.)  When he woke up in the morning, he sat in a chair for a while, took medicine, and ate cereal.  (*Id.*)  He spent his days in the chair, getting up to go to the bathroom or to prepare cereal or a frozen meal.  (*Id.*)  He did not care for any other people or animals.  (*Id.*)  He could dress, bathe, shave, and otherwise care for personal hygiene but he did it slowly, in stages, and caring for his hair caused pain.  (*Id.*)  He limited food and water to limit trips to the bathroom.  (*Id.*)  He prepared meals of cereal or frozen

meals twice a day and it took about five minutes.  (Tr. 178.)  He cleaned his efficiency apartment for about ten minutes a day.  (*Id.*)  Before the onset of his conditions, he would work a 12-hour labor job every day, practice karate, and watch movies.  (Tr. 177.)

Mr. Lilly did not need reminders to care for his personal needs and he watched the clock to be ready to take medications on time.  (Tr. 178.)  He went outside three times a week to get the mail.  (Tr. 180.)  When he went out, he walked, drove, or rode in a car.  (*Id.*)  He could drive and could go out alone.  (*Id.*)  He went shopping once a week in stores for 30 minutes to buy produce.  (*Id.*)  He also shopped on the computer.  (*Id.*)  He could pay bills, count change, handle a savings account, and use a checkbook/money order.  (*Id.*)  His ability to handle money had not changed since the onset of his conditions.  (*Id.*)

Mr. Lilly's hobbies and interests included reading and watching movies.  (Tr. 181.)  He did not do these activities much because of pain and he could not do anything else due to his conditions.  (*Id.*)  He spoke on the phone with his children daily and did not go anywhere on a regular basis.  (*Id.*)  He did not need to be reminded to go places because he did not go anywhere.  (*Id.*)  He did not have problems getting along with friends and neighbors.  (*Id.*)  His condition prevented him from engaging in social activities.  (*Id.*)

Mr. Lilly's condition limited his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, follow instructions, use hands, and get along with others.  (Tr. 182.)  This was because all strain and movements increased his pain. (*Id.*)  Mr. Lilly is right-handed.  (*Id.*)  He could walk 400 feet before needing to rest for 10-15 minutes.  (*Id.*)  He followed written instructions poorly.  (*Id.*)  He got along with authority figures "okay" and had never been fired or laid off for problems getting along with others.  (*Id.*) He did not handle stress or changes in routine well.  (Tr. 183.)  He was in constant fear of the

future and acknowledged that his way of living was "unusual." (*Id.*)  He was prescribed glasses/contacts and used a cane for walking.  (*Id.*)  He took medication but did not identify any side effects.  (Tr. 184.)

**D.  Hearing Testimony**

**1.  Plaintiff's Testimony**

At the telephonic hearing on July 5, 2023, Mr. Lilly responded to questions posed by the ALJ and his attorney. (Tr. 43-53.)  He testified that he stopped working after getting hurt at work on June 7, 2019. (Tr. 47-48.)  Since then, he had seen several doctors and was compliant with treatment. (Tr. 48.)  He lived alone. (Tr. 49.)

Regarding activities of daily living, Mr. Lilly tried to vacuum for five to ten minutes a day because he had to "break things up" and could not consistently do anything.  (Tr. 48.)  After vacuuming, he usually had to rest in a chair for a while or wear a soft cast to relieve neck pain. (*Id.*)  He could make his own meals but only made cereal or frozen dinners.  (Tr. 49.)  He could watch television for 10-15 minutes, but he could not concentrate on it and did not pay attention. (*Id.*)  It was difficult to stay in any position and he switched from trying to sit to leaning back to lying down; he had to rotate so he could not stay watching something for long.  (*Id.*)  He could not lift anything over eight pounds, such as a gallon of water or milk.  (*Id.*)  If he lifted more than that, he experienced pain and numbness down his arms.  (Tr. 50.)

Mr. Lilly went to doctor's appointments about three times per week.  (Tr. 48.)  Otherwise, he only went outside to go to the mailbox every other day.  (*Id.*)  The mailbox was about 400 feet from the house.  (Tr. 49.)  After going to the mailbox, Mr. Lilly had to sit and rest for a while because anything that strained the muscles, even just supporting the neck, could trigger it.  (*Id.*)  He did not visit people or go anywhere on a regular basis.  (*Id.*)

## 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Mr. Lilly's age, education, and work experience with the functional limitations described in the ALJ's RFC determination could not perform Mr. Lilly's prior work, but could perform representative positions in the national economy, including cafeteria attendant, office helper, and mail clerk. (Tr. 50-51.)  If the individual could lift no more than 10 pounds frequently and occasionally, occasionally kneel, crouch, and crawl, occasionally reach, and frequently handle and finger, the job of office helper would still be available, but the individual would otherwise be limited to sedentary work.  (Tr. 51-52.)  If the person would be absent more than two days per month or require up to eight unscheduled, 15-minute breaks per day, the VE testified that would preclude competitive employment.  (Tr. 52-53.)

## III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy.  *Id.*

## IV.     The ALJ's Decision

In her August 18, 2023 decision, the ALJ made the following findings:[1]

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.  (Tr. 29.)

2.      The claimant has not engaged in substantial gainful activity since June 7, 2020, the alleged onset date.  (*Id.*)

3.      The claimant has the following severe impairments: degenerative disc disease of the cervical spine.  (*Id.*)

---

[1] The ALJ's findings are summarized.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 31.)

5.      The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(a) except: lifting up to 20 pounds occasionally and 10 pounds frequently; never climbing ladders, ropes, or scaffolds; frequently climbing ramps and stairs, kneeling, and crouching; occasionally crawling; and frequently reaching, handling, and fingering. No work that requires exposure to unprotected heights, commercial driving, operating of dangerous moving equipment that requires two hands to hold, or operating power saws and jack hammers.  (Tr. 32.)

6.      The claimant is unable to perform any past relevant work.  (Tr. 35.)

7.      The claimant was born in 1969 and was 51 years old, defined as an individual closely approaching advanced age, on the alleged disability onset date.  (Tr. 36.)

8.      The claimant has at least a high school education.  (*Id*.)

9.      Transferability of job skills is not material to the determination of disability.  (*Id*.)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including cafeteria attendant, office helper, and mail clerk.  (Tr. 36-37.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from June 7, 2020, through the date of the decision on August 18, 2023.  (Tr. 37.)

## V.      Plaintiff's Arguments

Plaintiff raises two assignments of error: (1) the ALJ's determination that his mental impairments were not severe lacked the support of substantial evidence (ECF Doc. 9, pp. 6-8); and (2) the ALJ's physical RFC is not supported by substantial evidence because the ALJ's decision does not resolve inconsistencies in the record and omits discussion of evidence relating to his muscle strength, sensation, and improved pain with physical therapy (*id.* at pp. 8-12).

19

## VI.     Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the

Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030

(6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir.

1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall

be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing

42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of

choice within which the decisionmakers can go either way, without interference by the courts.'"

*Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.  First Assignment of Error: The ALJ's Finding that Plaintiff's Mental Impairments Were Not "Severe" at Step Two Was Supported by Substantial Evidence**

Mr. Lilly asserts that the ALJ failed to adequately consider his mental impairments at Step Two of the sequential evaluation, arguing that the ALJ lacked the support of substantial evidence when she found his mental impairments were not severe.  (ECF Doc. 9, pp. 6-8.)  The Commissioner responds that the ALJ adequately discussed the mental impairments and argues that the ALJ's findings were supported by substantial evidence.  (ECF Doc. 10, pp. 13-18.)

**1.  Legal Framework for Step Two Determinations**

A claimant bears the burden of showing the severity of her impairments.  *Foster v. Sec'y of Health & Hum. Servs.,* 899 F.2d 1221, at *2 (6th Cir. 1990) (unpublished table decision) (citing *Murphy v. Sec'y of Health & Hum. Servs.*, 801 F.2d 182, 185 (6th Cir. 1986)).  A "severe" impairment is defined under the regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work

21

activities."[2]  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)); *see also Long v. Apfel*, 1 F. App'x 326, 330-32 (6th Cir. 2001).

In evaluating a mental impairment, an ALJ must rate the claimant's degree of functional limitation in four broad areas of mental functioning using a five-point scale including: none, mild, moderate, marked, and extreme.  20 C.F.R. § 404.1520a(c), (e)(4).  The four broad areas of mental functioning are: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself.  20 C.F.R. § 404.1520a(c)(4).  "The four broad functional areas are also commonly referred to as the 'paragraph B' criteria.  *Avers v. Kijakazi*, No. 3:20-CV-01433, 2021 WL 4291228, at *9 (N.D. Ohio Sept. 21, 2021) (citation omitted).  If a claimant's degree of limitation is rated "as 'none' or 'mild,'" the conclusion will generally be that a claimant's "impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities."  20 C.F.R. § 404.1520a(d)(1).

The Sixth Circuit has construed Step Two as a de minimis hurdle, explaining that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  "The goal of the test is to 'screen out totally groundless claims.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (*quoting Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985)).  Although the standard is de minimis, it is recognized that a diagnosis alone "says nothing about the severity of the condition."  *Higgs*, 880 F.2d at 863;

---

[2] Being able to do basic work activities, means having "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1522(b).  Examples include: "(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."  (*Id.*)

*see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of those impairments, however, does not establish that [claimant] was significantly limited from performing basic work activities for a continuous period of time.").

In *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240 (6th Cir. 1987), the Sixth Circuit held that it is not reversible error for the Commissioner to deem an impairment "non-severe" in a case where other impairments have been found "severe," since the Commissioner could properly consider non-severe impairments in assessing the RFC.  *See id.* at 244; *see also Anthony*, 266 F. App'x at 457 (finding it "legally irrelevant" that some impairments were not deemed severe because the ALJ could consider "severe and non-severe impairments in the remaining steps of the sequential analysis"); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) (finding "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence" when ALJ found a severe impairment).  Conversely, a failure to consider a non-severe impairment in assessing the RFC has been found to be reversible error.  *See Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 190-191 (6th Cir. 2009) (distinguishing *Maziarz* and finding reversible error when an ALJ found a non-severe mental impairment "would not be considered in assessing her RFC"); *cf. Pompa,* 73 F. App'x at 803 (finding harmless error where the "ALJ considered all of [plaintiff]'s impairments in her residual functional capacity assessment").

More recently, in *Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000 (6th Cir. 2025), the Sixth Circuit considered a challenge to an ALJ's Step Two findings without applying a harmless error analysis.  Instead, the *Napier* court applied a substantial evidence analysis in assessing whether the ALJ erred in finding mental impairments non-severe at Step Two, or by failing to incorporate mental limitations into the RFC at Step Four.  *Id.*

2. **The ALJ's Finding That Mr. Lilly's Mental Impairments Were Not "Severe" Was Supported by Substantial Evidence**

In support of his argument that the ALJ lacked substantial evidence to find his mental impairments were not severe, Mr. Lilly highlights certain subjective complaints, reported treatment, and consultative examination findings and argues that the evidence suggests his major depressive disorder caused "more than a 'minimal effect' on the ability to do basic work activities." (ECF Doc. 9, pp. 6-7.) Further, he argues that the ALJ "fail[ed] to adequately consider" the findings of consultative examiner Dr. Gordon, his symptoms, and evidence that he was treating with medication and counseling, while relying "solely on the opinion of [consultative examiner] Dr. Whitlow" to find the mental impairments caused no more than mild limitations in his ability to perform basic work activities. (*Id.* at pp. 7-8.)

In response, the Commissioner notes that the ALJ supported her findings of no to mild limitations in the four areas of mental functioning at Step Two with citations to the consultative examination reports of both Drs. Whitlow and Gordan, mental status examination findings, and reported activities of daily living. (ECF Doc. 10, pp. 13-14.) Further, the Commissioner notes that the ALJ went on to discuss the medical opinion findings of the state agency psychological consultants and consultative examiners Drs. Whitlow and Gordan, and to make specific findings regarding the persuasiveness of those opinions, in support of her additional finding at Step Four that Mr. Lilly had only physical RFC limitations. (*Id.* at pp. 15-17.) To the extent that the ALJ did not discuss every piece of evidence highlighted by Mr. Lilly in his brief, the Commissioner asserts that the ALJ is not required to discuss all of the evidence. (*Id.* at pp. 17-18.)

In support of her finding that Mr. Lilly's mental impairments were non-severe at Step Two of the sequential evaluation, the ALJ explicitly considered: treatment records from Ochin that diagnosed major depressive disorder and generalized anxiety disorder but reflected largely

24

normal mental status examination findings "with the exception of irritable, lethargic behavior, tangential thought process and fair insight and judgment at times"; the consultative psychological examination report of Dr. Whitlow; and the consultative neuropsychological examination report of Dr. Gordon.  (Tr. 29-30.)  She also discussed each of the four broad areas of mental functioning, and supported her findings of no to mild limitations in each of those areas with citations to Mr. Lilly's mental status examination findings, clinical findings and medical opinions from Drs. Whitlow and Gordon, and Mr. Lilly's self-reported activities.  (Tr. 30.) Based on that evidence, she concluded that Mr. Lilly's mental impairments "cause no more than 'mild' limitation in any of the functional areas <u>and</u> the evidence does not otherwise indicate that there is more than a minimal limitation in [his] ability to do basic work activities[,]" and were therefore not severe.  (Tr. 30-31 (emphasis in original).)

The ALJ also discussed the relevant medical opinion evidence at Step Four,[3] finding first that the opinions of the state agency psychological consultants were persuasive to the extent they found Mr. Lilly did not have severe mental impairments, but that the evidence supported additional "mild" limitations in two areas of functioning.  (Tr. 34.)  The ALJ also found the medical opinion of Dr. Whitlow persuasive to the extent she found Mr. Lilly's mental impairments did not cause symptoms severe enough to interfere with his ability to work, but that her clinical findings supported "mild" limitations in certain areas of functioning.  (Tr. 34-35.) But the ALJ found the medical opinion of Dr. Gordon "not persuasive" to the extent that he found moderate to severe limitations when the "overall evidence" supported "none to mild limitations," and specifically noted that testing administered by Dr. Gordon was "invalid and uninterpretable due to excessive inconsistency due to variable responding."  (Tr. 35.)

---

[3] Mr. Lilly did not raise any assignments of error relating to the ALJ's persuasiveness findings for the state agency psychological consultants or the consultative examiner, and any such arguments are accordingly waived.

Although the ALJ did not specifically discuss every subjective report or objective finding cited in Mr. Lilly's brief, it is well established that an ALJ need not "discuss each piece of data in [his] opinion, so long as [he] consider[s] the evidence as a whole and reach[es] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)).  Having considered the ALJ's broad analysis of the treatment records, consultative examination findings, medical evidence, and subjective reports relating to Mr. Lilly's mental impairments, the undersigned concludes based on the ALJ's written decision that she considered the evidence as a whole and reached a reasoned conclusion.  Certainly, Mr. Lilly has not met his burden to show that the ALJ's Step Two findings lacked the support of substantial evidence.

Plaintiff's assertion that the ALJ cited "only" the diagnosis in Dr. Gordon's report (ECF Doc. 9, p. 8) is unfounded, as the ALJ also cited findings from Dr. Gordon in discussing several areas of mental functioning (Tr. 30) and additionally explained her reasoning for finding the report unpersuasive (Tr. 35).  His argument that the ALJ failed to consider his treatment with counseling (ECF Doc. 9, p. 8) is also unsubstantiated, as the ALJ specifically cited to the clinical findings from his counseling records from in support of her Step Two findings (Tr. 29-30).[4]  Mr. Lilly's additional argument that the ALJ "relie[d] solely on the opinion of Dr. Whitlow in concluding that Plaintiff's mental impairment imposes no more than 'mild' limitations on his ability to perform basic work activities" (ECF Doc. 9, p. 8) is not consistent with the record.  As discussed above, the ALJ considered and relied upon the clinical findings in Mr. Lilly's treatment records, his own subjective reports, the clinical findings and medical opinions of Drs.

---

[4] Mr. Lilly also argues that the ALJ erred by not noting his self-reported use of psychiatric medications for depression and night terrors.  (ECF Doc. 9, pp. 6, 8 (citing Tr. 227).)  He does not cite to medical records substantiating his use of these prescriptions and the undersigned is aware of none.

Whitlow and Gordon, and the medical opinions of the state agency psychological consultants. While Mr. Lilly may have preferred that the ALJ interpret and weigh the evidence differently, "'[t]he substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakely*, 581 F.3d at 406 (internal citation omitted).

Mr. Lilly's additional argument that Dr. Whitlow's assessment is "flawed" (*id.*) does not change this analysis. Mr. Lilly argues the assessment is flawed because "Dr. Whitlow concludes that she did not 'gather sufficient evidence' to conclude that Plaintiff's mental health symptoms 'debilitate his function and working ability.'" (*Id.*) He suggests this language makes it unclear whether Dr. Whitlow adequately evaluated his level of mental functioning, arguing that "one's symptoms need not be 'debilitating' to be considered severe." (*Id.*) But this argument ignores the clear language of Dr. Whitlow's report, where she observed that Mr. Lilly's "self-reports were consistent across the interview" in that he consistently "denied" his depression or anxiety "impair[ed] his functioning or working ability." (Tr. 992.) Dr. Whitlow found these denials consistent with her own "professional observations" that Mr. Lilly "did not present with any significant, observable, or readily identifiable mental health signs" during the evaluation. (Tr. 992.) It was in this context that Dr. Whitlow explained "consistent with [Mr. Lilly's] reports" that she "did not gather sufficient enough evidence to support concluding that his mental health symptoms debilitate his functioning and working ability" and offered her "professional opinion that [Mr. Lilly] does not experience any mental health symptomology that is severe to cause him to have impairments with engaging in the work world."[5] (*Id.*) Plaintiff's argument that this finding is "unclear" or "flawed" is not supported by a review of the plain language of the report.

---

[5] The ALJ also found credible Mr. Lilly's assertion that he was unable to work due to his physical impairments, but explained she "is not trained, credentialed, or qualified to draw conclusions about [Mr. Lilly's] physical medical

For the reasons set forth above, the undersigned concludes that Mr. Lilly has not met his burden to show that the ALJ lacked the support of substantial evidence when she found Mr. Lilly's mental impairments were not severe at Step Two of the sequential analysis.  Accordingly, the undersigned finds the first assignment of error to be without merit.

## C.        Second Assignment of Error: The RFC Was Supported by Substantial Evidence

In his second assignment of error, Mr. Lilly argues that the ALJ erred because she adopted an RFC that was not supported by substantial evidence.  (ECF Doc. 9, pp. 8-12.)  In particular, he argues that the ALJ "failed to resolve inconsistencies in the record and provide a reasoned and 'logical bridge'" between the evidence and her findings when she cited only to supportive evidence and failed to acknowledge detracting evidence regarding Mr. Lilly's muscle strength, sensation, and improved pain in response to physical therapy.  (*Id.* at p. 11.)  The Commissioner argues in response that "the ALJ considered the medical evidence of record, including reported symptoms and activities of daily living, examination findings, imaging studies, and treatment history/efficacy" (ECF Doc. 10, p. 19) and "built an 'accurate and logical bridge' between the evidence and her conclusions" (*id.* at p. 21).

A claimant's "residual functional capacity is the most [he] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1).  "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)).  An ALJ assesses a claimant's "residual functional capacity based on all the relevant evidence in [the] case record."  20 C.F.R. § 404.1545(a)(1).  "[A]n ALJ does not improperly assume the role of a

---

health conditions and therefore cannot provide any professional opinion about [his] ability to effectively engage in the work world or gain/maintain gainful employment based off of his physical medical health condition." (Tr. 992.) She recommended that he receive a physical evaluation to further evaluate these claims.  (*Id.*)

medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe*, 342 F. App'x at 157.

In support of her RFC findings, the ALJ provided the following discussion of Plaintiff's medical treatment records:

> The evidence indicates that the claimant suffered an injury to his neck and right shoulder at work on June 7, 2020. Since then, he has had complaints of neck pain with numbness and tingling down the arms. Treatment records note that the claimant underwent a cervical spine x-ray on June 24, 2020 which showed severe degenerative disc changes at C5-6 and C6-7 with posterior spurring noted to be greatest at C5-6. A cervical spine MRI performed at that time demonstrated severe degenerative narrowing at C4-C5 and C6 with mild effacement of the subarachnoid space at C6 with significant disc osteophyte complex effacing the subarachnoid space at C5 and a central and left paramedian bulge at C4. The evidence also indicates that the claimant underwent an EMG and nerve conduction study on June 1, 2021, which showed acute/chronic nerve root lesion at or about the bilateral C5-6 nerve root. The claimant has been diagnosed with spinal stenosis of the cervical region with cervicalgia and radiculopathy (Exhibits 3F, pp. 1, 13, 20-222, 43; 4F, p. 12; 10F, pp. 2, 6, 8, 15; 11F, p. 8). Physical exams have noted muscle spasm and tightness in the bilateral cervical paraspinal/upper trapezius regions and limited range of motion of the cervical spine but good to normal muscle strength at 4/5 to 5/5, normal reflexes and intact sensation on most occasions (Exhibits 1F, p. 7; 3F, pp. 1, 8, 14, 15; 6F, pp. 2, 3, 5). Treatment has been conservative consisting of physical therapy, chiropractic treatments including massage therapy, and medication including Baclofen. He has not undergone surgery. Moreover, the evidence indicates that the claimant's pain improved with physical therapy (Exhibits 4F, pp. 1, 6, 13; 5F, p. 8; 8F; 10F, pp. 2, 47; 11F; 12F; 13F; 16F).

(Tr. 33 (emphasis added).)  Mr. Lilly argues that the above reasoning is "flawed and unsupported by the evidence" because: (1) while the ALJ found "[p]hysical exams have noted . . . good to normal muscle strength at 4/5 to 5/5" (Tr. 33), the "examination findings consistently characterize 'weakness' or reduced (not 'good to normal') strength in [his] upper extremities" (ECF Doc. 9, p. 11); (2) while the ALJ found "[p]hysical exams have noted . . .  intact sensation on most occasions" (Tr. 33), the "physical examination findings routinely note diminished sensation in Plaintiff's bilateral upper extremities" and "[i]n fact, on almost every occasion, this abnormal finding is noted" (ECF Doc. 9, p. 11); and (3) while the ALJ found Mr. Lilly treated

conservatively and that "the evidence indicates that [Mr. Lilly]'s pain improved with physical therapy" (Tr. 33), the ALJ relied on findings in massage therapy records that "fail to allude to any improvement in his pain, and reference only 'good' response to therapy" and did not acknowledge chiropractic treatment records showing continued reports of pain (ECF Doc. 9, p. 11 (citing Tr. 793, 798, 910, 1085, 1170, 1178)).  Each argument will be addressed in turn.

      1.      **"Good to Normal Muscle Strength at 4/5 to 5/5"**

In support of her finding that Mr. Lilly's physical exams noted "good to normal muscle strength at 4/5 to 5/5," the ALJ cited to chiropractic, orthopedic, and internal medication records containing examination findings that are consistent with a muscle strength of "4/5 to 5/5."  (Tr. 33 (citing Tr. 244 (noting "[m]uscle strength was weak at grade -4/5 over the right supraspinatus, deltoid, biceps and triceps muscles" and "over the C4-7 levels"), Tr. 745 (noting "motor function has returned to grade 5"), Tr. 753 (noting 5/5 upper extremity strength), Tr. 758 (same), Tr. 978 (noting normal strength in all muscle groups and 5/5 motor strength in all four extremities), Tr. 979 (noting 4/5 strength in cervical spine and 5/5 strength in all other areas).)

Mr. Lilly responds that his examination findings, contrary to the ALJ's description, "consistently characterize 'weakness' or reduced (not 'good to normal') strength," citing clinical findings from an independent medical examination and orthopedic and chiropractic records. (ECF Doc. 9, p. 11 (citing Tr. 287-88 (noting the motor exam "was decreased in the left ulnar with attempted finder abduction" but the "right was less so"), Tr. 307-08 (noting 5/5 upper extremity strength with "very slight weakness maybe 5 minus/5" in one position), Tr. 749 (noting "finger flexion and triceps weakness bilaterally left greater than right"), Tr. 762 (noting finger flexors "grade 4 week left greater than right" and triceps "grade 4 week period"), Tr. 998 (noting "[m]uscle strength was weak at grade -4/5 over the C4-5 and at the C6-7 levels").)

Mr. Lilly does not apparently dispute the ALJ's finding that the relevant exams measured his motor strength at 4/5 to 5/5.  Indeed, this characterization appears consistent with the records cited by both the ALJ and Mr. Lilly.  Certainly, none of the cited records measured his motor strength at 3/5 or less.  But Mr. Lilly challenges the ALJ's characterization of the 4/5 to 5/5 motor strength findings as "good to normal" when the language used instead in many of the records includes words like "weakness" or "decreased" strength.  (ECF Doc. 9, p. 11.)  While Mr. Lilly's complaint on this point is understandable, the undersigned concludes that the ALJ's use of measurable clinical findings ("4/5 to 5/5") to modify or explain the more general language she used to describe those findings is both sufficient to explain her reasoning and consistent with the underlying evidence cited both by the ALJ in her decision and by Mr. Lilly in his brief.

### 2.    "Intact Sensation on Most Occasions"

In support of her finding that Mr. Lilly's physical examinations noted "intact sensation on most occasions," the ALJ cited to chiropractic, orthopedic, and internal medication records that contain some examination findings that are consistent with intact sensation and some that reflect some abnormal or diminished sensation.  (Tr. 33 (citing Tr. 244 (7/21/20 exam noting "hypoesthesia over the C4-7 dermatomes"), Tr. 745 (6/13/20 exam noting "[s]ensation is intermittently diminished in the left greater than right upper extremity"), Tr. 753 (6/1/21 exam finding sensation intact with no sensory deficit C1-C8), Tr. 759 (same), Tr. 978 (6/16/22 exam noting no focal neurological deficit).)

In response, Mr. Lilly asserts that his examination findings "note diminished sensation" in his upper extremities "routinely" and "on almost every occasion," citing to examination findings from an independent medical examination and orthopedic and chiropractic records. (ECF Doc. 9, p. 11 (citing Tr. 287-88 (8/19/20 exam noting "decreased right lateral shoulder sensory and decreased dorsal wrist sensation" and "some decreased right small finger

sensation"), Tr. 749 (5/18/21 exam noting diminished sensation radiating primarily into the C7

and C6 distribution), Tr. 762 (6/25/20 exam noting "no sensory changes"), Tr. 998 (10/10/22

exam noting "hypoesthesia over the C4-5 and at C6-7 dermatomes").)

In his opposition brief, the Commissioner cites to additional medical records in support of

the ALJ's finding that Mr. Lilly's physical examinations noted "intact sensation on most

occasions," including records from an independent medical examination and orthopedic and

emergency room providers.[6]  (ECF Doc. 10, pp. 19-20 (citing Tr. 325 (8/4/21 exam finding

"[s]ensory examination was intact"), Tr. 591 (6/7/20 exam finding "[n]ormal sensation of

hand"), Tr. 642 (6/25/20 exam finding no sensory changes), Tr. 702 (7/9/20 exam finding

sensory function of upper extremities has returned to normal).)

The medical records cited by the ALJ and the parties, viewed together, support a finding

that Mr. Lilly's examination findings sometimes revealed intact sensation, sometimes revealed

"decreased," "diminished," or "intermittently diminished" sensation, and sometimes revealed

hypoesthesia.  Mr. Lilly argues that the ALJ's characterization of these records as showing

"intact sensation on most occasions" (Tr. 33) is "flawed and unsupported by the evidence" (ECF

Doc. 9, p. 11).  But the same argument could be made regarding Mr. Lilly's characterization of

the records as noting diminished sensation "routinely" and "on almost every occasion."  (*Id.*)

While the substantial evidence standard is deferential, the Sixth Circuit has emphasized

that the chief limitation to that deference "is the requirement that all determinations be made

based upon the record in its entirety."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th

Cir. 2007) (citing *Houston v. Sec'y of Health & Hum. Servs.*, 736 F.2d 365, 366 (6th Cir. 1984)).

"This requirement that determinations be made in light of the record as a whole helps to ensure

---

[6] Some additional records highlighted by the Commissioner appear to be duplicate copies of records previously cited by the ALJ.  *Compare* Tr. 387-88 *with* Tr. 759.

that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history[.]"  *Id.*; *see also* 20 C.F.R. § 404.1520(e) (findings regarding RFCs will be "based on all the relevant medical and other evidence" in the case record).

An ALJ need not "discuss each piece of data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)).  But she must perform "a proper analysis of the medical evidence under agency regulations and controlling case law," and may not "cherry-pick[] select portions of the medical record" to support her findings.  *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013); *see also Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where ALJ was "selective in parsing the various medical reports").  In other words, an ALJ cannot simply "pick and choose" evidence in the record, "relying on some and ignoring others, without offering some rationale for h[er] decision." *Young v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 644, 649 (E.D. Mich. 2004).

Here, the ALJ considered a cross-section of the evidence and characterized the physical examination records as showing "intact sensation on most occasions," while acknowledging and citing to records that showed, variously, hypoesthesia, intermittently diminished sensation, and intact sensation.  (Tr. 33.)  While Mr. Lilly would instead have characterized the records as showing diminished sensation "routinely" and "on almost every occasion," the undersigned finds that the ALJ sufficiently explained her reasoning in considering the variable evidence regarding Mr. Lilly's sensation on physical examination, and did not rise to the level of mischaracterizing the relevant evidence.  Ultimately, "'[t]he substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by

the courts.'"  *Blakely*, 581 F.3d at 406.  In this context, the undersigned concludes that the ALJ's

discussion of the sensory findings is both sufficient to explain her reasoning and consistent with

the underlying evidence cited by the ALJ in her decision and by the parties in their briefs.

    **3.**    **"Pain Improved with Physical Therapy"**

The ALJ cited to a variety of records in support of her findings that Mr. Lilly's treatment

was conservative—consisting of physical therapy, chiropractic treatments, massage therapy, and

baclofen, and not including surgery—and that "the evidence indicates . . . [Mr. Lilly]'s pain

improved with physical therapy."  (Tr. 33 (citing Tr. 793, 798, 910, 1007-08, 1010, 1085

(massage therapy records noting a "good" response to therapy); 805 (IME history noting 7/9/20

report of "slow but steady progress" in physical therapy); 1040 (7/8/20 physical therapy record

indicating "[p]atient reports that his neck overall improved since beginning formal therapy" and

that he "[i]s able to sleep better"); 997-1011 (chiropractic treatment notes); 1092-1169

(emergency room, chiropractic, massage therapy, and physical therapy treatment notes); 1170-

1217 (independent medical exam and chiropractic, massage therapy, and physical therapy

treatment notes); 1218-41 (independent medical exams and chiropractic treatment notes); Tr.

1263-70 (chiropractic treatment notes).)

Mr. Lilly argues that the evidence cited by the ALJ does not support her conclusion that

his "pain improved with physical therapy."  (ECF Doc. 9, p. 11.)  For example, he observes that

the massage therapy records cited by the ALJ only indicate that he had a "good" response to

therapy, not that his pain improved with therapy.  (*Id.* (citing Tr. 793, 798, 910, 1085, 1170,

1178).)  In contrast, Mr. Lilly asserts—without supporting citations—that he "consistently

report[ed] ongoing neck pain" to his chiropractor Dr. Copp during the same time period.  (*Id.*)

In response, the Commissioner provides specific citations to Mr. Lilly's physical therapy

records, which include the following notes regarding Mr. Lilly's progress during treatment:

- 6/29/20 record noting Mr. Lilly said he was "a little bit sore after [the] last session but after that he felt good" and was having improved sleep (Tr. 305, 559);

- 7/2/20 note indicating Mr. Lilly was "doing better overall" with "[n]o longer headaches" and "[h]is neck pain no longer consumes M" (Tr. 301, 565);

- 7/6/20 note indicating Mr. Lilly "reports overall his neck is feeling better" with "[l]eft sided symptoms greater than right" (Tr. 299); and

- 7/8/20 note indicating Mr. Lilly "reports that his neck overall improved since beginning formal therapy" and that he "[i]s able to sleep better" (Tr. 293);

- 7/9/20 note indicating Mr. Lilly "is making slow but steady progress in therapy" and his "headaches are gone" but "he still has pain with some activities" (Tr. 702).

(*See* ECF Doc. 10, p. 20 (citations above).)  Some of these reports were directly cited by the ALJ in support of his finding that "the evidence indicates . . . [Mr. Lilly]'s pain improved with physical therapy."  (Tr. 33 (citing Tr. 805 (IME history quoting 7/9/20 physical therapy record), 1040 (7/8/20 physical therapy record).)  Others of the reports were referenced by the ALJ when she cited generally to exhibits containing the reports.  (*Id.*; *see* Tr. 1196 (6/29/20 record), 1202 (7/6/20 record), 1204 (7/2/20 record), 1206 (7/8/20 record); *see also* Tr. 1198 (8/13/20 record stating "although his strength is improved radicular pain develops with any activities").)

Having considered the records referenced by the ALJ in support of her findings, the undersigned concludes that substantial evidence supported her finding that "[t]reatment has been conservative consisting of physical therapy, chiropractic treatments including massage therapy, and medication including Baclofen," and that Mr. Lilly "has not undergone surgery."  (Tr. 33.)  These facts are not in dispute.  The cited records additionally supply substantial evidence to support the ALJ's further finding that "the evidence indicates that [Mr. Lilly]'s pain improved with physical therapy."  (Tr. 33.)  Over the course of his physical therapy, Mr. Lilly reported to his physical therapy providers that he was doing better overall, his neck pain no longer consumed

35

him, his sleep was better, his neck was feeling better and overall improved, and he no longer had
headaches, although he still had pain with activities. (*See* Tr. 305, 301, 299, 293, 702, 1198.)

Turning to Mr. Lilly's argument that he consistently reported ongoing neck pain to his
chiropractic provider (ECF Doc. 9, p. 11), the question before this Court is whether that fact—
even if it is substantiated by the treatment records—deprives the ALJ's stated findings of the
support of substantial evidence. It is clear that the ALJ accurately characterized the medical
records when she discussed Mr. Lilly's conservative treatment and self-reported improvement
with physical therapy. The question thus becomes whether the ALJ erred when she failed to
additionally discuss Mr. Lilly's reports of ongoing pain to his chiropractic providers.

As discussed above, an ALJ need not "discuss each piece of data in [her] opinion, so long
as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion," *Boseley*, 397
F. App'x at 199, but she must nevertheless perform "a proper analysis of the medical evidence
under agency regulations and controlling case law" and may not "cherry-pick[] select portions of
the medical record" to support her findings, *Minor*, 513 F. App'x at 435. Here, the ALJ
acknowledged that Mr. Lilly "has indicated that he is unable to work due to neck pain since a
work injury," cannot lift much weight "due to pain down his arms with numbness," suffers from
strained neck muscles when he walks to the mailbox, must wear a soft collar after five minutes of
housework, and loses concentration after watching television for ten minutes. (Tr. 33.) She also
acknowledged in discussing his medical treatment records that he had "complaints of neck pain
with numbness and tingling down the arms" since his June 7, 2020 injury, with abnormal
findings in x-rays, MRIs, EMGs, and physical exams. (*Id.*) The ALJ accurately characterized
Mr. Lilly's chiropractic treatment as "conservative" and noted that he reported improved pain
with physical therapy, but did not suggest that the pain resolved or that Mr. Lilly did *not* report

36

pain to his chiropractic providers.  In this context, and keeping in mind that "'[t]he substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts,'" *Blakely*, 581 F.3d at 406, the undersigned concludes that the chiropractic records generally referenced in Mr. Lilly's brief are insufficient to deprive the ALJ of substantial evidence to support her finding that Mr. Lilly's treatment was conservative and his pain improved with physical therapy.

For the reasons set forth above, the undersigned concludes that Mr. Lilly has not met his burden to show the ALJ lacked substantial evidence to support her evaluation of the treatment records, or failed to build a logical bridge between the evidence and her conclusions, when she adopted a light RFC at Step Four of the sequential analysis.  Even if there is substantial evidence to support Mr. Lilly's preferred findings, this Court cannot overturn the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  Accordingly, the undersigned finds the second assignment of error is without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.


December 17, 2025


*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).